

_____

No. 3:21-CV-663-CWR-LGI
*consolidated with*
No. 3:21-CV-667-CWR-LGI
No. 3:22-CV-171-CWR-LGI

J.W., *a minor, by and through Amanda Williams, Guardian and Next Friend, et al.*,

Plaintiffs,

*v.*

THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; THE MISSISSIPPI DEPARTMENT OF HEALTH; JIM CRAIG; TRILOGY ENGINEERING SERVICES, LLC; AND JOHN DOES 1-40,

Defendants.

_____

ORDER

_____

Before CARLTON W. REEVES, *District Judge*.

Water is essential. In the Book of Genesis, water precedes light and land, plants and trees, animals and people.[1]

_____

[1] *Genesis* 1:2 (New Revised Standard Version).

Water has power and force: God told Noah that He would "bring a flood of waters on the earth, to destroy from under heaven all flesh in which is the breath of life."[2]

Water also cleanses, purifies, and renews, as when the Hebrew prophet Amos admonished the Israelites to "let justice roll down like waters, and righteousness like an ever-flowing stream."[3]

And just as the Old Testament opens centering the importance of water, the New Testament closes comparing water to life itself: "Let the one who is thirsty come," it says, "and let anyone who wishes take the water of life as a gift."[4]

Mississippians know firsthand the promise and power of water—that water can both supply and take away. We know that the waters of the Mississippi River nourished and sustained the Native peoples who inhabited its alluvial plain thousands of years ago. But we also know of water's capacity to destroy. For example, in 1927, the Great Mississippi Flood, "one of America's greatest peacetime disasters,"[5] killed hundreds of people in the Mississippi Delta and left hundreds of thousands more without food, shelter, clothing, or work. Less than a century later, in 2005, a hurricane and storm surge of Biblical proportions wiped out the Mississippi Gulf Coast, killing

---

[2] *Genesis* 6:17 (New Revised Standard Version).

[3] *Amos* 5:24 (New Revised Standard Version).

[4] *Revelation* 22:17 (New Revised Standard Version).

[5] THE AMERICAN RED CROSS, THE FINAL REPORT OF THE COLORED ADVISORY COMMISSION APPOINTED TO COOPERATE WITH THE AMERICAN NATIONAL RED CROSS AND THE PRESIDENT'S COMMITTEE ON RELIEF WORK IN THE MISSISSIPPI VALLEY FLOOD DISASTER OF 1927 (1929).

hundreds of people and uprooting hundreds of thousands of lives.

Water has been fundamental to our history.

That is why the conduct that the Plaintiffs have alleged here is so poignant. The Mississippians who brought this suit are children who have relied upon Jackson's water all their lives. Far from sustaining life, they say, Jackson's water shortens it: the lead-contaminated water that flows through Jackson's pipes has poisoned their bodies and impeded their development. Worse, they continue, City and State officials have been deliberately indifferent to their plight.

The City of Jackson's response? That its officials' claims of safety weren't technically lies, but, even if they were, the City "did not compel [the Plaintiffs] to drink water."[6]

The Plaintiffs' allegations have yet to be proven. This lawsuit is still in its early stages. For now, though, this Court concludes that the Plaintiffs have stated at least *some* legitimate claims for relief against at least *some* of the Defendants. Thus, their suit may proceed.

## I.        A Decade of Neglect

Jackson's water system was broken long before its collapse in August 2022. Indeed, the City has had water system issues in some form since its selection as the state's Capitol in 1822.[7] But we need not go back that far to understand this litigation.

---

[6] Docket No. 127 at 2.

[7] Emily Le Coz, Daniel Connolly, Hadley Hitson, and Evan Mealins, *Jackson Water Crisis Flows From a Century of Poverty, Neglect, and Racism*, THE CLARION-LEDGER (Oct. 25, 2022), shorturl.at/fzQS8 (tracing the City's water issues over time).

The conditions that gave rise to this suit can be traced back to 2013. That year, the Plaintiffs allege, the Mississippi State Department of Health ("MSDH") warned Jackson officials that federally mandated testing had revealed increasing levels of lead in the City's water supply. The City's Interim Director of Public Works Willie Bell communicated this finding to other Jackson officials and explained that the likely cause of the increase was the high acidity level from the Pearl River Basin site and a malfunctioning lime-feed injection system at the water treatment plant.[8] Bell also warned that most of Jackson's homes had pipes that were partially or completely made of lead, and that lead-contaminated water could pose a high risk of lead poisoning to children.[9]

Despite these warnings, almost two years passed without any action from MSDH or the City.

Then, in July 2015, officials from MSDH again discovered elevated lead levels in the Pearl River Basin and the Ross Barnett Reservoir—the City's two main water sources.[10] By this time, the lead levels exceeded what the United States Environmental Protection Agency ("EPA") considers "safe" for

---

[8] Lime-feed injection systems are used to clean and purify water by eliminating suspended matter and cloudiness.

[9] Docket No. 51 at 30—31.

[10] At the beginning of this crisis, Jackson had two water systems: the Pearl River Basin and the Ross Barnett Reservoir constituted the City's main system, but the City also drew water from the Maddux Road Well Water System. Docket No. 51 at 3. Unlike the Pearl River Basin and Reservoir, the Well Water System never failed any lead tests. *Id*. at 29. But in August 2014, the City discontinued servicing residents (largely in South Jackson) from the Well Water System and switched them to the Pearl River Basin or the Reservoir. *Id*. at 36–37.

drinking water. MSDH's tests revealed that 22.4% of the homes it sampled had dangerously high concentrations of lead in their drinking water.[11]

More months passed with no action.

In late January 2016, State and City officials informed Jackson's residents—for the first time—of the high concentrations of lead in their water. But when City officials finally shared the information with the public, they grossly downplayed the severity of the problem. City Public Works Director Kishia Powell was emphatic: "Our water is safe,"[12] she said; "there is no lead in the drinking water as it leaves the plant."[13]

---

[11] The Plaintiffs contend that this number is understated because MSDH's "pre-flushing" testing methodology was known to yield artificially low lead levels. Docket No. 51 at 43–44. Pre-flushing is the process of running water for a certain amount of time before capturing it for usage or testing; the effect is to "run off" some of the lead particles that have built up in the pipes. The EPA considers pre-flushing an evasive technique and has warned against its use. *Id.*; *see also* Docket No. 51, Ex. 4 at 1.

[12] Docket No. 51 at 52 (quoting Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, THE CLARION-LEDGER (Jan. 29, 2016), https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-leadsome-jackson-residents-water/79510298/).

[13] *Id.* at 54 (quoting Anna Wolfe, *Jackson City Council Talks Lead Water*, THE CLARION-LEDGER (Feb. 19, 2016), https://www.clarion-ledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/). Powell's successor, Robert Miller, made a similarly misleading statement, proclaiming in 2018 that "there's been no detecting of lead or copper in the water supply." Docket No. 51 at 56 (quoting Justin Vicory, *Department of Health Says Jackson Is in Violation of Safe Drinking Water Requirements*, THE CLARION-LEDGER (July 18, 2018), http://www.clarionledger.com/story/news/local/2018/07/18/Jackson-violating-safe-drinking-water-requirements-health-dept/798010002/).

"We're not Flint," said then-Mayor Tony Yarber.[14] But the reality was that, in some ways, Jackson's water crisis was more dire than Flint's: whereas 16.7% of households in Flint were affected by the city's lead-contaminated water, more than a fifth (22.4%) of Jackson's households were so affected.[15]

About one month after Mayor Yarber and other City officials sought to pacify Jackson's residents with tales of the water's safety, Jonathan Yaeger, an employee at the Jackson Public Works Department, found evidence of lead materials while replacing one of the City's main underground water pipes. He brought it up with leaders at the Public Works Department and offered to raise the issue with the City Council, but Public Works officials discouraged the reporting. So Yaeger went public with what he knew about the high level of corrosivity in the water, the presence of lead in the City's pipes, and the threat of lead poisoning to children across the city.[16] Powell immediately terminated Yaeger for "creating unwarranted public fear."[17]

In February 2016, MSDH issued the first of several boil-water notices for the City of Jackson. It also began working with the City on a Compliance Plan that would bring the water system into compliance with the federal Safe Drinking Water Act ("SDWA").[18] The Plan required Jackson to reduce the acidity

---

[14] *Id.* at 53 (quoting Wolfe & Fowler, *supra* n.12).

[15] *Id.* at 42

[16] *Id.* at 62 (quoting KARE Staff, *Water Worker Fired After Talking About Lead to Media* (Mar. 29, 2016), https://www.kare11.com/article/news/nation-now/water-workerfired-after-talking-about-lead-to-media/108980682.

[17] *Id.*

[18] Docket No. 51, Ex. 5.

level in its water system by maintaining a pH of at least 8.5 and an alkalinity level of between 50 mg/l and 70 mg/l by October 2016. Because most of the lead in residents' water was a result of the water moving through the City's ancient lead pipes (as opposed to lead problems at the treatment plant), the City was also required to adopt a Corrosion Control Plan ("CCP"). As part of the CCP, the City agreed to install new equipment that would help raise the water's pH and reduce corrosion in the lead-coated distribution lines. But according to the Plaintiffs, the City did not begin installing the necessary equipment for the CCP until October 2017—more than a year after it adopted the Plan.

In late Spring 2016, the City of Jackson hired Trilogy Engineering Services to study the water system's corrosion problem and help the City determine how it might better comply with the SDWA. This was, of course, after the City had entered into the Compliance Plan with the MSDH, which was ostensibly designed to achieve the same goal. In any event, Trilogy performed the study and recommended to Jackson that it maintain a pH of 8.6 and "retrofit the liquid lime system into a system which uses soda ash."[19]

The City adopted Trilogy's recommendation on the use of soda ash, but this brought about a host of new problems. Because the City's water treatment plants were not designed to accommodate soda ash, and because Mississippi experiences high levels of humidity in the summer, the soda ash formed rock-like clumps in the system that jammed the feed. This further exacerbated water delivery problems. So, the City had to scrap that plan and was back where it began.

---

[19] Docket No. 51 at 65.

Mayor Chokwe Antar Lumumba informed the public of the soda ash problem and of the City's history of violations in a press conference on July 18, 2018.[20] He explained that the problems dated back at least two administrations, and that his father, the first Mayor Lumumba, had incorporated line items into the City's 2014 budget to fix the system, but that Mayor Yarber removed those line items upon assuming the mayoralty.[21]

For the remainder of 2018 and continuing through 2020, the City consistently failed to get the water system back up and running. Instead, the City, in conjunction with MSDH, issued a series of boil water notices. According to the Plaintiffs, these notices only served to worsen the problem because "the water boils off and evaporates but the lead does not, leading to a higher concentration of toxic lead in the resulting drinking water."[22]

By 2020, the EPA was back in the picture. In early February of that year, representatives from the EPA arrived in Jackson to inspect the City's water treatment plants for compliance with the SDWA. They found several violations. These included violations that the City had already made public (like the difficulty of maintaining an adequate pH level), and previously unreported violations, like malfunctioning disinfection devices, nonfunctioning membrane integrity testing equipment,

---

[20] Docket No. 51, Ex. 2.

[21] *Id.*

[22] Docket No. 51 at 61.

and violations of the National Public Drinking Water Regulations.[23]

The EPA's Director of Enforcement and Compliance explained these violations in an Emergency Administrative Order sent to Mayor Lumumba on March 27, 2020. She concluded that the City's violations "present an imminent and substantial endangerment to the persons served by the system," and that the severity of the violations required ongoing "public notification" until the EPA determined that such reporting was no longer necessary.[24] The Plaintiffs allege that the City immediately violated the Order by withholding the Order from the public for more than an entire year.[25]

Since that time, Jackson has had to report to the EPA issues regarding water turbidity, filter performance, and City efforts to fix its deficient water treatment systems. Also since that time, Jackson has received many more Notices of Noncompliance from the EPA for its inability to repair its broken water system.[26]

In August 2022, flooding at the Pearl River and Reservoir sites caused the water system to finally collapse.[27] Many residents were without water for nearly a week, requiring them to find

---

[23] Docket No. 51, Ex. 1.

[24] *Id.*

[25] Docket No. 51 at 69.

[26] *See, e.g.,* Docket No. 51, Ex. 7.

[27] Alex Rozier & Bobby Harrison, *Jackson Water System Is Failing, City Will Be with No Or Little Drinking Water Indefinitely*, MISSISSIPPI TODAY (Aug. 29, 2022), https://mississippitoday.org/2022/08/29/jackson-water-system-fails-emergency/

alternate ways to cook, clean, and perform other daily tasks. Schools closed. Businesses closed, some of them indefinitely.

The crisis led the City and State governments to declare a state of emergency[28] and focused the attention of the Nation on the City's crumbling water infrastructure.[29] In late-November 2022, District Judge Henry T. Wingate appointed a third-party administrator to stabilize the water system.[30] Shortly thereafter, Congress allocated over $600 million to repair the City's broken water system.[31]

Unfortunately, that help came too late for the Plaintiffs.

* * *

These cases are brought by children affected by the water crisis.[32] J.W. is the minor child of Amanda Williams.[33] Born in 2008, J.W. has lived in the City of Jackson her entire life. At

---

[28] *Id.*

[29] Ahmad Hemingway, *Jackson Water Crisis Reignites Nationwide Aging Infrastructure Conversation in Other Cities*, ABCNews.com (Sept. 3, 2022), https://abcnews.go.com/US/jackson-water-crisis-reignites-nationwide-aging-infrastructure-conversation/story?id=89269330

[30] *United States of America v. The City of Jackson*, No. 3:22-CV-686-HTW-LGI, Docket No. 2 (S.D. Miss. Nov. 29, 2022).

[31] Nick Judin, *Jacksonians Must Boil Water As Washington Clears $600 Million For Water Crisis*, Mississippi Free Press (Dec. 23, 2022), https://www.mississippifreepress.org/29921/congress-sends-600-million-for-jackson-water-crisis-to-bidens-desk

[32] These cases were consolidated on July 20, 2022. *See* Docket No. 110 (explaining that the Court has "consolidated the cases for early motion practice and discovery purposes" and directing all filings to Cause No. 3:21-CV-663-CWR-LGI).

[33] Docket No. 51 at 67.

the time of this lawsuit, J.W. would have been drinking, bathing in, and otherwise ingesting the City's contaminated water for nearly 14 years.

She has the scars to prove it: J.W., like many other minor residents of the City of Jackson, has been diagnosed with an elevated blood-lead level. As a result, J.W. has experienced "cognitive deficits; behavioral issues; difficulty focusing; difficulty completing schoolwork, chores, and/or other tasks; and [] other emotional issues"—all allegedly brought on by her exposure to Jackson's tap water.[34]

Plaintiffs P.R., C.A., and their nearly 1,000 co-Plaintiffs tell a similar tale.[35] Born between 2003 and 2021, these Jacksonians were recipients of the City's water services throughout the crisis. Yet they were not made aware of the toxins in the City's water and were never provided any kind of in-home filtration system to help them clean their water. As a result, these Plaintiffs, too, have been diagnosed with lead poisoning. Like J.W., they have suffered cognitive deficits, behavioral issues, difficulty focusing, emotional issues, and more.

Seeking redress, their families have brought federal and state law claims against the City of Jackson, Mississippi; its current Mayor Chokwe Antar Lumumba; former Mayor Tony Yarber; former Jackson Public Works Director Kishia Powell; former Jackson Public Works Director Jerriot Smash; former Jackson Public Works Director Robert Miller; MSDH; MSDH Senior

---

[34] *Id.*

[35] They are named Plaintiffs in Cause Nos. 3:21-CV-667-CWR-LGI and 3:22-CV-171-CWR-LGI.

Deputy Jim Craig; Trilogy Engineering Services LLC; and 40 unnamed defendants.

In Counts 1 and 2 of the Amended Complaint, the Plaintiffs allege Fourteenth Amendment Due Process claims against the City and individual Defendants. In Count 3, they allege a state-law negligence claim against the State, City, and individual Defendants. Counts 4 and 5 allege negligence claims against Trilogy Engineering.[36]

The State, City, and individual Defendants have filed several motions, including motions to dismiss, for judgment on the pleadings, and for qualified immunity. This Order resolves those motions.[37]

## II.      Legal Standards

### A.      Dismissal

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor.[38] The complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief."[39] While this requires "more than an unadorned, the defendant unlawfully-harmed-me accusation," the

---

[36] At oral argument, the parties agreed that the Plaintiffs also pled a *Monell* claim, which the City has thus far not challenged. This Order does not address that claim.

[37] Trilogy Engineering Services, LLC, has not sought to be dismissed from this action.

[38] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[39] *Id*. at 677–78 (quotation marks and citation omitted).

plaintiff need not plead "detailed factual allegations."[40] The plaintiff's claims must be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[41]

### B.     Judgment on the Pleadings

The legal standard for a Rule 12(c) motion for judgment on the pleadings is the same as for a Rule 12(b)(6) motion to dismiss: "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[42] "The plaintiff must plead enough facts to state a claim to relief that is plausible on its face" and those facts must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[43]

### C.     Qualified Immunity

Qualified immunity protects public officials from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[44]

The qualified immunity analysis has two steps: "First, a court must decide whether the facts that a plaintiff has alleged or

---

[40] *Id*. at 678 (quotation marks and citation omitted).

[41] *Id*. (citation omitted).

[42] *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

[43] *Id*.

[44] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

shown make out a violation of a constitutional right."[45] Second, "the court must decide whether the right at issue was clearly established at time of the defendant's alleged misconduct."[46]

The "clearly established" analysis does not require plaintiffs to show that the exact act has been previously held unlawful;[47] it requires only that the unlawfulness of the challenged act be apparent "in light of pre-existing law."[48] In other words, qualified immunity does not attach when state actors engage in "obvious violations of the Constitution."[49]

At the motion to dismiss stage, the plaintiff bears the burden of demonstrating the inapplicability of the qualified immunity defense.[50]

### III.   Discussion

### A.   Fourteenth Amendment Claims

First, the Plaintiffs argue that they have a "clearly established" Fourteenth Amendment due process right to bodily integrity.[51] They contend that the Defendants "were aware that their conduct could result in the deprivation of Plaintiff's fundamental due process right[]," yet "knowingly breached"

---

[45] *Jamison v. McClendon*, 476 F. Supp. 3d 386, 409 (S.D. Miss. 2020) (citations omitted).

[46] *Id.*

[47] *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1995).

[48] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[49] *Villarreal v. City of Laredo*, 17 F.4th 532, 536 (5th Cir. 2021).

[50] *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012).

[51] Docket No. 51 at 77.

that right "by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiff[s]."[52]

Second, the Plaintiffs argue that they have a "clearly established" Fourteenth Amendment right "to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law."[53] By "deliberately and affirmatively den[ying], l[ying] about, cover[ing] up, deceiv[ing], discredit[ing] and ignor[ing] [] known dangers and risks of harm to which they exposed Plaintiff[s]," the Defendants engaged in "affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to Plaintiff[s]."[54]

The Defendants counter that the Plaintiffs have failed to state a constitutional claim under the bodily integrity theory and that the Fifth Circuit does not recognize the state-created danger theory. But even if the Plaintiffs were able to plead a constitutional claim, the Defendants argue, qualified immunity would bar their suit.

### 1.    The Right to Bodily Integrity

The Defendants maintain that the Plaintiffs' bodily integrity claim fails because (1) "there is no Constitutional right to contaminant-free water,"[55] and (2) the Fifth Circuit "has not

---

[52] *Id.* at 77–78.

[53] *Id.* at 79.

[54] *Id.* at 79–80.

[55] Docket No. 61 at 20.

recognized a claim for violation of the substantive due process right to bodily integrity from government-caused exposure to pollutants."[56] They further argue that in "every case in which the Fifth Circuit has found a violation of bodily integrity, a state actor had direct physical contact with the plaintiff."[57]

Of course, the Plaintiffs disagree on each count. As to the first, the Plaintiffs argue that the Defendants "misrepresent[] Plaintiffs' claims and misapprehend[] the case law": "Plaintiffs do not claim that Craig had a duty to protect them from contaminated water, but rather, that he violated their rights to bodily integrity when he made decisions and took actions that caused, contributed to, exacerbated, and/or prolonged their ingestion of lead contaminated water."[58] According to the Plaintiffs, these decisions demonstrate Craig's deliberate indifference to the harm posed to the Plaintiffs, in violation of their substantive due process right to bodily integrity.[59]

On the second count, the Plaintiffs respond that the "sparsity" of Fifth Circuit case law directly on point "does not equate to caselaw that disallows bodily integrity claims";[60] after all, "the Supreme Court often determines the existence of the right in the absence of preexisting cases on point" and its precedent in the bodily integrity context is both "abundant" and

---

[56] Docket No. 81 at 7; *see also* Docket No. 83 at 9-10; Docket No. 87 at 1 (incorporating by reference the City of Jackson's arguments).

[57] Docket No. 81 at 5; *see also* Docket No. 83 at 10; Docket No. 87 at 1.

[58] Docket No. 79 at 15.

[59] *Id.*

[60] Docket No. 114 at 58.

16

binding on the Fifth Circuit.[61] The Plaintiffs also disagree with the Defendants' insistence on "direct physical contact." Relying on the Fifth Circuit's recent decision in *Tyson v. City of Sabine*, 42 F.4th 508 (5th Cir. 2022), the Plaintiffs maintain that "[p]hysical force is not a requirement of a violation of the right to bodily integrity."[62]

The Defendants seek qualified immunity on this claim. Because the Court must consider an assertion of qualified immunity "at the earliest possible stage,"[63] the Court's analysis starts there. Under that framework, the Court first examines whether the Plaintiffs' Amended Complaint alleges a violation of a Fourteenth Amendment right.[64] The Court then considers whether the right was clearly established at the time of the Defendants' alleged misconduct.[65]

Having reviewed the history of the right at issue and the relevant case law, the Court finds that the Plaintiffs have sufficiently pled a violation of a constitutional right, but that the asserted right was not clearly established at the time of the Defendants' alleged misconduct.

### a.    A Right Steeped in Our History

The right to bodily integrity is rooted in the Fourteenth Amendment's Due Process Clause. The history of that

---

[61] *Id.*

[62] Docket No 114 at 58 (quoting *Tyson*, 42 F.4th at 518).

[63] *Saucier v. Katz*, 533 U.S. 194 (2001).

[64] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (outlining standard).

[65] *Id.*

Amendment and of the right to bodily integrity supports finding a violation of a constitutional right on the facts of this case.

The Fourteenth Amendment was a direct response to the dehumanization and indignities that characterized chattel slavery.[66] In constructing the Due Process Clause of that Amendment, the drafters sought to secure to all "persons," specifically formerly-enslaved Black Americans, not just the guarantees of those rights enumerated in the Bill of Rights, but other unenumerated rights "'necessary for the protection and maintenance and perfect enjoyment of the rights thus specifically named.'"[67] Today, we refer to the Due Process Clause's protection of unenumerated rights as "substantive due process."

Early American legal history is replete with examples of courts giving effect to categories of rights that would today be classified as substantive due process.[68] That practice continued even after the adoption of the Fourteenth Amendment, when judicial "invocations of 'due process' were frequently

---

[66] *See* Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 YALE L.J. 408, 477–82 (2010) (discussing the intent of the Amendment's legislative drafters).

[67] *Id.* at 478 (quoting CONG. GLOBE, 39th Cong., 1st Sess. 1291-93); *see also* Brandon Hasbrouck, *The Antiracist Constitution*, 116 B.U. L. REV. 87, 137 (2022) (discussing the Due Process Clause's role in extending the Bill of Rights).

[68] *See, e.g.*, Samuel Warren & Louis Brandeis, *The Right of Privacy*, 4 HARV. L. REV. 193, 193–207 (1890) (tracing the common law foundations of modern-day substantive due process rights); Williams, *supra* n.66 at 460–70 (discussing pre- and post-ratification cases discussing the protection of unenumerated rights).

what we would now call 'substantive' due process."[69] Thus, in *Hurtado v. California*, 110 U.S. 516 (1884), the first post-ratification case in which the Supreme Court explicated the meaning of the Fourteenth Amendment's Due Process Clause, the Court variously describes "due process of law" as having elements of both process and substance. The *Hurtado* Court cites approvingly an 1874 case from the Supreme Court of Mississippi, which held that due process of law "refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized."[70] "If any of [these rights] are disregarded in the proceedings by which a person is condemned to the loss of life, liberty, or property," it continued, "then the deprivation has not been by 'due process of law'."[71]

The *Hurtado* Court's invocation of "fundamental rights" evinces a substantive consideration that goes beyond whatever procedures attend a deprivation.[72] And that is how the Due Process Clause was understood for the better part of the

---

[69] Jamal Greene, *The Meaning of Substantive Due Process*, 31 CONST. COMMENT. 253, 255 (2016).

[70] *Hurtado*, 110 U.S. at 536 (quoting *Brown v. Board of Levee Commissioners*, 50 Miss. 468, 479 (1874)).

[71] *Id.*

[72] The Supreme Court was aware of the substantive aspect of the Due Process Clause. Three years after *Hurtado*, the Court decided *Mugler v. Kansas*, 123 U.S. 623 (1887). There, the Court was confronted with a Due Process Clause challenge asking whether a state law prohibiting the manufacture and sale of intoxicating liquors for personal use deprived the individual of liberty or property under the Fourteenth Amendment. In resolving that question, Justice Stone held that there are "limits beyond which the legislature cannot rightfully go" when creating a rule which affects fundamental rights. 123 U.S. at 660–61.

19

next century.[73] It was not until the 1980s that activist scholars began the project of trying to distinguish "substantive" and "procedural" due process, to cast doubt on the former.[74]

The substantive due process right to bodily integrity is rooted in the common law "right to one's person."[75, 76] While the

---

[73] The seminal case that opponents of substantive due process point to is the now-infamous *Lochner v. New York*, 198 U.S. 45 (1905). That case has rightfully been repudiated and this Court does not rely on it except to illustrate the following point: None of the justices in *Lochner*—neither the five in majority nor the four in dissent—disagreed about the substantive aspect of the Due Process Clause. As Edward Corwin has written, "the dissenting judges were not protesting so much against the idea that due process of law means reasonable law, or, in other words, the court's opinion of reasonable law, as against the view that the statute before them was unreasonable." Edward S. Corwin, *The Doctrine of Due Process of Law Before the Civil War*, 24 HARV. L. REV. 366, 367 (1911). This suggests that the Justices were in general agreement about the ability of the Due Process Clause to protect substantive rights. Indeed, by the time the Court decided *Whitney v. California*, 274 U.S. 357, 373 (1927), the idea of a substantive component to the Due Process Clause had been well-established, with the once-skeptical Justice Brandeis conceding  that "all fundamental rights comprised within the term 'liberty' are protected by the Federal Constitution," and that "it is settled that the Due Process Clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure."

[74] *See* Greene, *supra* n.69, at 276–77 (debunking the history behind the "textual" objection to protecting substantive rights through the Due Process Clause).

[75] T. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 29 (1879).

[76] The common law right can be traced back to the 39th Article of Magna Carta as "the right of personal security." Charles Shatluck, *The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty, and Property,"* 4 HARV. L. REV. 365, 373 (1891). Blackstone identified the right as one of the three elements of "liberty"

common law right most often sounded in tort, American courts acknowledged early on the fundamental role that bodily integrity played in other areas of American life and law.[77]

The transfiguration of the right of bodily integrity from strict tort application to more general application happened most prominently in *Union Pacific Railway Co. v. Botsford*, 41 U.S. 250 (1891).

The question in *Botsford* was whether a court may order an individual to submit to a surgical examination for the purpose of proving that they suffered an injury.[78] Answering in the negative, the Court observed that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person."[79] To allow surgical examination, the Court thought, would amount to an "inva[sion]" of "[t]he inviolability of the person," which "no order of process" could cure.[80] Justices Brewer and Brown dissented, but not because they disagreed with the existence a right to bodily integrity;

---

guaranteed to all Englishmen. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 424 (1769).

That the right to bodily integrity started out as a common law right is not surprising or unique. The Supreme Court has recognized that many fundamental liberty interests include "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

[77] W. PROSSER, THE LAW OF TORTS 9 at 35 (4th ed. 1971) (the "element of personal indignity involved always [was] given considerable weight").

[78] 41 U.S. at 251.

[79] *Id.*

[80] *Id.* at 252.

rather, they thought that courts could compel such an exami-
nation under some circumstances.[81]

Today, *Botsford* is widely hailed by scholars, judges, and jus-
tices as one of the first major cases establishing the right to
bodily integrity.[82] From that foundation, the Court has con-
tinued to recognize that the right is broad enough to cover
other novel fact patterns.[83]

Consider *Rochin v. California*, 342 U.S. 165 (1952). When con-
fronted by sheriff's deputies in his home about the ownership
of certain narcotics, Antonio Rochin grabbed the drugs and
swallowed them.[84] The deputies arrested Rochin, took him to
the hospital, and directed the doctor to "force[] an emetic so-
lution through a tube into Rochin's stomach."[85] The proce-
dure caused Rochin to vomit, which allowed the deputies to

---

[81] *Id*. at 258–59 (Brewer, J., dissenting).

[82] *See, e.g.*, Erwin Chemerinsky, *Substantive Due Process*, 15 TOURO L. REV.
1501–34 (1999); *Abigail Alliance v. Von Eschenbach*, 445 F.3d 470, 486 (D.C.
Cir. 2006) (citing *Botsford* to hold that regulations limiting access to poten-
tially life-saving drugs impinged on a fundamental liberty interest based
in substantive due process); *Olmstead v. United States*, 277 U.S. 438, 478
(1928) (Brandeis, J., dissenting) ("The makers of our Constitution under-
took to secure conditions favorable to the pursuit of happiness. They rec-
ognized the significance of man's spiritual nature, of his feelings and of
his intellect. . .. They conferred, as against the government, the right to be
let alone—the most comprehensive of rights and the right most valued by
civilized men.").

[83] *See, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952); *Winston v. Lee*, 470 U.S.
753 (1985); *Washington v. Harper*, 494 U.S. 210 (1990); *Cruzan v. Director
Missouri Dep't of Health*, 497 U.S. 261 (1990).

[84] *Rochin*, 342 U.S. at 166.

[85] *Id*.

recover the evidence. Rochin was brought to trial and convicted for violating California's Health and Safety Code.[86]

On appeal at the United States Supreme Court, Rochin argued that the state violated his Fourteenth Amendment right to due process by forcing him to vomit against his will. The Court agreed. Writing for a unanimous Court, Justice Frankfurter described the Fourteenth Amendment's promise of "due process of law" as "a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental'."[87] Forcing an individual to vomit did "more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. [It] is conduct that shocks the conscience."[88]

*Botsford* and *Rochin* are demonstrative of the Court's efforts to jealously protect the inviolability of the person and the right to bodily integrity.

To be sure, there is a subset of the Court's bodily integrity jurisprudence holding that some factual scenarios do not offend the Due Process Clause. But even there, the Court is careful to affirm the broad scope of the Fourteenth Amendment right. For example, in *Washington v. Harper*, 494 U.S. 210 (1990), the Court considered whether a State may treat a mentally ill prisoner with antipsychotic drugs against his will. Though the Court concluded as a matter of procedural due process that

---

[86] *Id.*

[87] *Id.* at 169 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)).

[88] *Id.* at 172.

Washington State's pre-enforcement administrative scheme "[met] the demands of the Due Process Clause," it also observed, as a matter of substantive due process, that Harper "possesse[d] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs,"[89] and that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."[90]

The Court's decision in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) took a similar approach. The issue there was whether the right to refuse medical treatment is protected by the Fourteenth Amendment's Due Process Clause, such that Missouri's regulation violated that right. The Court held that Missouri did not violate the Due Process Clause by requiring clear and convincing evidence of the incompetent person's desire to have medical treatment

---

[89] 494 U.S. at 221.

[90] *Id*. at 229. The Court decided *Riggins v. Nevada*, 504 U.S. 127 (1992), two years after *Harper*. In *Riggins*, the Court again considered whether the forced administration of antipsychotic medication violated due process. But the facts were a little different: As a pre-trial detainee, Riggins had been given an anti-psychotic to help deal with imaginary voices and hallucinations. He decided, however, that he did not want to continue those medications during trial because he wanted jurors to observe his "true mental state." *Id*. at 130. The state nevertheless continued to administer the drug. At the Supreme Court, Riggins argued that being made to take the medications violated his due process rights. The Court found, consistent with *Harper*, that Riggins had a substantial liberty interest in refusing the drug. But unlike in *Harper*, the Court found that the state did not meet its burden in establishing the need for the drug, so Riggins' liberty interest prevailed.

24

withdrawn.[91] But it was careful to note the important substantive right at issue: "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."[92] The Court even went so far as to assert that the Fourteenth Amendment "would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition."[93]

In these cases, in other words, the Supreme Court acknowledged the central importance of the individual's professed liberty interest but ruled for the state on procedural grounds.[94]

Following the Supreme Court's lead, the Courts of Appeals have recognized the enduring nature of the right to bodily integrity to protect individuals from nonconsensual intrusions into their persons.[95]

---

[91] 497 U.S. at 281.

[92] *Id*. at 278.

[93] *Id*. at 279.

[94] Indeed, the Court has explained in other contexts that it has "never retreated . . . from [its] recognition that *any* compelled intrusion into the human body implicates significant, constitutionally protected . . . interests." *Missouri v. McNeely*, 569 U.S. 141, 159 (2013) (emphasis added).

[95] *See*, *e.g.*, *Rogers v. Okin*, 634 F.2d 650, 653 (1st Cir. 1980) ("[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment"), *vacated and remanded* by *Mills v. Rogers*, 457 U.S. 291, 303 (1982) (right only applies to involuntarily admitted patients); *United States v. Brandon*, 158 F.3d 947, 953 (6th Cir. 1998) (forced medication implicates . . . [the] liberty interest in being free from bodily intrusion."); *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983) (holding that "compulsory treatment with anti-psychotic drugs may invade a patient's interest in

The Sixth Circuit's recent decision in *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019), *den'g reh'g and reh'g en banc*, 924 F.3d 309 (6th Cir. 2019), is particularly instructive.[96] There, as here, a group of Plaintiffs sued various state and local officials for knowingly dispensing drinking water with elevated levels of corrosivity and harmful chemicals. The Plaintiffs claimed that, in knowingly supplying this contaminated water and misleading citizens about its harmful effects, the state and local officials violated their Fourteenth Amendment right to bodily integrity.

The district court found that the Plaintiffs had sufficiently pled a violation of their Fourteenth Amendment Due Process rights, and the Sixth Circuit agreed. Reviewing the bodily integrity precedent from the Supreme Court and the Courts of Appeals, the Sixth Circuit held that "a government actor violates an individual's right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."[97]

This Court reaches a similar conclusion: the weight of Supreme Court precedent and the persuasive precedent of the Courts of Appeals reveal that the Fourteenth Amendment's right to bodily integrity is violated when the government

---

bodily integrity, personal security and personal dignity. . . . It should be obvious in light of this liberty interest that the state cannot simply seize a person and administer [electroconvulsive therapy] to him without his consent.").

[96] *See Chavis v. Borden*, 621 F. App'x 283, 288 (5th Cir. 2015) (holding that the Fifth Circuit "may consider the law of other circuits when determining whether a constitutional right is clearly established.").

[97] *Guertin*, 912 F.3d at 921.

induces unwitting citizens to consume lead-contaminated water without their consent.

### b.    A Right Violated, but Not "Clearly Established"

Viewing the facts in the light most favorable to the Plaintiffs, as the Court must at this stage, the Court finds that the Plaintiffs have sufficiently alleged a violation of their right to bodily integrity against each of the Defendants. But the Court cannot say that the right was clearly established at the time of the Defendants' misconduct.

Start first with the constitutional violation. In evaluating whether the Plaintiffs have alleged a violation of their Fourteenth Amendment right to bodily integrity, the Court must consider whether the Defendants' actions "shock the conscience."[98] That standard is satisfied where "the conduct was intended to injure in some way unjustifiable by any government interest, or . . . if it resulted from deliberate indifference."[99] To show deliberate indifference, the plaintiff must allege facts indicating that the state actor "consciously disregard[ed]" a known and excessive risk to the victim's health and safety.[100] In some cases, deliberate indifference can be inferred "from the fact that the risk of harm is obvious."[101]

Here, the Plaintiffs' Amended Complaint alleges that the Defendants were, at various points starting in 2013 and

---

[98] *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

[99] *Id*. (citing *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018)) (internal quotation marks omitted).

[100] *Id*. at 252.

[101] *Hope v. Pelzer*, 536 U.S. 730, 737 (2002).

continuing through the present day, the decision-makers responsible for deliberately concealing, prolonging, and exacerbating the dangerous water conditions which gave rise to this action.[102] Specifically, the Plaintiffs allege that the actions taken by the City of Jackson and its employees (here, Lumumba, Yarber, Powell, Smash, and Miller) induced them to consume water with dangerous levels of lead and corrosivity, and that these Defendants actively concealed and understated those dangers when communicating with Jackson's citizens.

The Plaintiffs further allege that MSDH and its employees (namely, Craig) further induced them to ingest the City's unsafe water by actively concealing the water's elevated lead levels and directing lower-level MSDH employees to use testing methodologies that masked the true amount of lead in the water. The Plaintiffs assert that this was done deliberately and in direct violation of federal safe water regulations. As alleged in the Amended Complaint, the Defendants knew of the risks of lead poisoning from the City's water and consciously disregarded those risks when they encouraged Jackson's citizens to continue using the water by "either explicitly asserting or otherwise strongly implying, that Jackson's water was safe to drink when it in fact was not."[103]

The Court agrees that the Defendants' actions here are "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience."[104] The Amended Complaint tells a story of City and State governments that inherited and then exacerbated a long-standing public health crisis

---

[102] Docket No. 51 at 15–20.

[103] *Id.* at 51–52.

[104] *Lewis*, 523 U.S. at 847 n.8.

28

by failing to take corrective action over nearly a decade. The incompetence of most of the officials involved is evident on the face of the Amended Complaint.

But were that the sole story of the Amended Complaint, there would be no case; mere incompetence does not work a constitutional violation.

What makes the allegations here conscience-shocking (and therefore unconstitutional) is the way the City and State governments handled the situation. Upon learning of the toxic levels of lead in the City's water supply, the Defendants did not move residents to a safer water system, allocate additional funding to fix the existing system, or even timely warn residents of the dangers lurking in their pipes. To the contrary, the City and State Defendants knowingly concealed, misled, and gaslit the City's residents for years. The allegations in the Amended Complaint suggest that these Defendants knew the truth and intentionally told the Plaintiffs just the opposite. By going to such lengths to conceal the extent of the problem from the public, the Defendants deprived the Plaintiffs of the ability to decide for themselves whether they would continue using the contaminated supply or search for another water source.

To this, the Defendants argue, both in their brief and again at oral argument, that they "did not compel [the Plaintiffs] to drink water."[105] That argument is as shocking as it is meritless. The toxic water that caused the Plaintiffs' injuries flowed throughout the City of Jackson, saturating every school, day care, church, sports facility, medical clinic, restaurant, and recreational gathering spot—every place the Plaintiffs could

---

[105] Docket No. 127 at 2.

have been expected to use or drink water. Without accurate information about the severity of the water crisis, the Plaintiffs could not weigh the risks or make an informed choice about their water consumption. In a very real way, the Defendants' actions stripped the Plaintiffs of the ability to decide for themselves how they would protect their health.

Because of that, this case is on all fours with the kinds of forced, involuntary intrusions on bodily integrity that the Supreme Court recognized in *Hurtado*, *Botsford*, *Rochin*, *Riggins*, and even *Harper* and *Cruzan*. In each of those cases, it was the compulsory nature of the government's action that violated the Plaintiff's due process rights. But unlike in *Harper* and *Cruzan*, the government has no legitimate interest in misleading its citizens about the safety of their drinking water.[106] After all, water is fundamental to life.[107]

To overcome the qualified immunity bar, though, a plaintiff must do more than plead a violation of a constitutional right. They must also show that the alleged right was clearly established when the defendant violated it. The Plaintiffs cannot do so here.

---

[106] Indeed, one of the primary aims of government is to manage its water resources to extract "the greatest measure of benefits therefrom" for productive use by the citizenry. Ernest A. Engelbert, *The Functions of Government in Water Resources Development*, 25 Proceedings of the Annual Meeting (Western Farm Economics Association), 60, 60–63 (1952).

[107] At least NASA seems to think so. *See* Brian Dunbar, *Interview with Philip Ball: Water: The Molecule of Life*, NASA.GOV (Nov. 30, 2007), https://www.nasa.gov/vision/universe/solarsystem/Water:_Molecule_of_Life.html (explaining that, when looking for signs of life on other planets, NASA looks for the presence of water because water is fundamental to all known forms of life).

In this Circuit, the determination of whether a right was clearly established turns on whether the law's prohibition of the defendant's conduct was "so clear[] and unambiguous[]" that "every 'reasonable official would understand that what he is doing violates [the law].'"[108] To find that a right was clearly established, the court "must be able to point to controlling authority—or a robust 'consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity."[109]

Here, the Plaintiffs have not offered (and the Court cannot find) any controlling authority establishing with particularity the bodily integrity right that they press.

Instead, the Plaintiffs rely upon the Sixth Circuit's recent decision in *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019) to support the existence of a clearly established right.[110] That reliance is misplaced for at least three reasons.

First, *Guertin*'s finding of a clearly established right rested on the strength of the Sixth Circuit's prior bodily integrity precedent. The *Guertin* Court read cases like *Nishiyama v. Dickson City*, 814 F.2d 277 (6th Cir. 1987),[111] *Doe v. Claiborne City*, 103 F.3d 495 (6th Cir. 1996), *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), and *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012), to establish the seemingly

---

[108] *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc) (quoting *al-Kidd*, 563 U.S. at 741).

[109] *Id.*

[110] Docket No. 114 at 25, 31, 41.

[111] The court recognized that *Nishiyima* was abrogated on other grounds. *See Jones v. Reynolds*, 438 F.3d 685, 694–95 (6th Cir. 2006).

uncontroversial principle that "individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest."[112] Framed as such, the Fourteenth Amendment right the *Guertin* plaintiffs claimed—which is nearly identical to the right claimed by the Plaintiffs here—was a natural outgrowth of the Sixth Circuit's caselaw.

Unfortunately for these Plaintiffs, though, this Circuit's precedents provide no basis to justify that right.

Second, *Guertin* was decided more than five years after most of the unconstitutional conduct alleged in our Plaintiffs' Amended Complaint began. It is impossible, therefore, that the Sixth Circuit's decision in *Guertin* would have put these Defendants on notice that their misconduct violated the Plaintiffs' Fourteenth Amendment rights.[113]

Finally, and perhaps most obviously, although a well-reasoned and common-sense application of the law, *Guertin* is not controlling authority for this Court. And because *Guertin* is the Plaintiffs' only comparable case alleging a bodily integrity claim, it cannot be said that there exists the kind of "robust persuasive authority" necessary to support finding a clearly established right.[114]

---

[112] *Planned Parenthood Sw. Ohio Region*, 696 F.3d at 506.

[113] *See Harlow*, 457 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments.").

[114] The Supreme Court has cast some uncertainty as to whether circuit courts can even produce the controlling authority. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018) ("We have not yet decided what

In sum, although the Plaintiffs have plausibly alleged that Defendants Craig, Lumumba, Yarber, Powell, and Miller violated their Fourteenth Amendment right to bodily integrity when they induced the Plaintiffs to consume toxic, lead-contaminated water without their informed consent, that right was not clearly established at the time the Defendants engaged in it.[115] Thus, the Court finds that the judicially created doctrine of qualified immunity once again works to insulate Defendants from liability for their gross misconduct, which, as we must find at this stage of the proceedings, has caused harm to these Plaintiffs. Accordingly, the individual Defendants' motions to dismiss, for judgment on the pleadings, and for qualified immunity with respect to the bodily integrity claim are **GRANTED**.[116]

### c.     The City of Jackson's Violations

Because the City of Jackson is not eligible for qualified immunity, its arguments necessarily take a different form. The City argues that "there is *no* substantive due process right to a clean environment."[117] It further argues that in "every case

---

precedents—other than our own—qualify as controlling authority for purposes of qualified immunity.").

[115] As far as Defendant Smash is concerned, apart from setting forth his employment with the City from May 2016 to October 2017, the Plaintiffs alleged no facts showing that Smash specifically violated any of their rights. *See Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007) (holding that the court must "consider the conduct of each officer independently," not "collectively"). Thus, Smash's motion for judgment on the pleadings would be granted for this additional reason.

[116] "But let us not be fooled by legal jargon. Immunity is not exoneration." *Jamison*, 476 F. Supp. 3d at 392.

[117] Docket No. 81 at 6 (emphasis in original).

33

in which the Fifth Circuit has found a violation of bodily integrity, a state actor had direct physical contact with the plaintiff."[118] Both arguments are without merit.

It should be clear at this point that the right the Plaintiffs claim is different from the right the Defendants suggest that the Plaintiffs are claiming. The Court pauses here to make the discrepancy explicit.

The Defendants suggest that the Plaintiffs seek "a right to contaminant-free water,"[119] or a "right to a clean environment,"[120] and that both of those assertions are foreclosed by Supreme Court and Fifth Circuit precedent. The Court agrees that if the Plaintiffs pled such a positive right, it would have to deny relief. After all, it is black-letter law that the Fourteenth Amendment generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property."[121]

That is not the case here. These Plaintiffs have pled a negative right—that is, a right to be free *from* harmful government action. This positive right/negative right distinction is not just wordplay. The right to be free from lead-contaminated water does not turn into "a right to clean water" by operation of simple negation. A right to clean water assumes that the government is required to provide water. But the Plaintiffs here make no such assumption. Their asserted right—to be free from being made to consume toxic or contaminated water without

---

[118] *Id.* at 5.

[119] Docket No. 61 at 20.

[120] Docket No. 81 at 6.

[121] *Rust v. Sullivan*, 500 U.S. 173, 201 (1991).

their informed consent—acknowledges that the government
is not required to provide water at all. But once the govern-
ment has opted to provide water, it cannot poison the water's
recipients and then mislead them about the presence of that
poison. That nuanced but significant distinction is fundamen-
tal to due process adjudication—and constitutional adjudica-
tion more generally.[122]

The Plaintiffs' "careful[ly] descri[bed]" right,[123] is consistent
with and derivative of the kinds of liberty interests the Found-
ers and early American courts sought to protect.[124] It makes
good sense, then, that the Supreme Court protected the Four-
teenth Amendment right to bodily integrity in cases like
*Botsford* and *Rochin*, and equally good sense that it would pro-
tect the right at issue here. If the Constitution protects a "com-
petent person['s]" "right to refuse lifesaving hydration and

---

[122] The Supreme Court has long recognized that the government does not
have to provide a service, but once it does, the provision of that service is
subject to constitutional constraints. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254
(1970); *see also Dandridge v. Williams*, 397 U.S. 471, 522 (1970) (Marshall, J.,
dissenting) ("[T]he Court has already recognized several times that when
a benefit, even a 'gratuitous' benefit, is necessary to sustain life, stricter
constitutional standards, both procedural and substantive, are applied to
the deprivation of that benefit.").

[123] *Reno v. Flores*, 507 U.S. 292, 302 (1993). Worried about the expansion of
substantive due process, the Supreme Court and the Fifth Circuit have re-
quired plaintiffs to plead with specificity the right they are claiming. *Id*.
The Plaintiffs have done so here.

[124] *See Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983) (Posner, J.)
("the Constitution is a charter of negative rather than positive liberties").

35

nutrition,"[125] it certainly protects their right to refuse life-altering or life-threatening toxins.

The City's second argument—that a bodily integrity claim requires "direct physical touch"—finds no basis in the Supreme Court's or Fifth Circuit's caselaw. For its part, the Fifth Circuit has been explicit that "[p]hysical force is not a requirement of a violation of the right to bodily integrity."[126] And in affirming the right claimed in *Rochin*, *Harper*, and *Cruzan*, the Supreme Court's cases can be read to reject such a requirement.

Thus, the City of Jackson's motion for judgment on the pleadings on the bodily integrity claim is **DENIED**.

### 2.    State-Created Danger

Next, the Plaintiffs argue that they have a Fourteenth Amendment right to be protected from the "risks, dangers, and dangerous situation" that were "affirmatively created and/or caused by persons acting under color of state law."[127]

The Defendants' response on the merits is two-fold: first, the Defendants argue that "[t]he Fifth Circuit has repeatedly declined to recognize a state-created danger theory of liability,"[128] and second, even if the Court were to apply that theory here, the Plaintiffs' claim would fail because they do not "identify a private, third-party actor" as required under Fifth Circuit precedent.[129] The individual Defendants add that this

---

[125] *Cruzan*, 497 U.S. at 279.

[126] *Tyson v. City of Sabine*, 42 F.4th 508, 518 (5th Cir. 2022).

[127] Docket No. 51 at 18, 79–81.

[128] Docket No. 81 at 8; Docket No. 61 at 4, 10.

[129] Docket No. 81 at 10.

Court need not reach the merits because they are entitled to qualified immunity on this claim, too.[130]

Once again, the Court starts its analysis with the qualified immunity issue, recognizing that the Defendants are entitled to that protection if the Plaintiffs fail to show either (1) the violation of a constitutional right or (2) that the right was "clearly established" at the time of the complained-of conduct.

### a.        The Individual Defendants

Under the precedent in this Circuit, the Plaintiffs' state-created danger claim against the individual Defendants must fail because "the theory of state-created danger is not clearly established law."[131] Thus, the Plaintiffs cannot meet their burden on that prong of the qualified immunity analysis, and the individual Defendants—Lumumba, Yarber, Powell, Miller, Smash, and Craig—are entitled to that protection.

Of course, the reason why the state-created danger claim is "not clearly established" and "uncertain" in the Fifth Circuit is because that court has avoided every opportunity to clarify it. While the Fifth Circuit has identified the elements that plaintiffs must satisfy to prove such a claim, every such invocation is accompanied by a statement expressing uncertainty

---

[130] *See* Docket No. 61 at 11–12; Docket No. 83 at 9; Docket No. 85 at 5; Docket No. 87 at 3.

[131] *Shumpert v. City of Tupelo*, 905 F.3d 310, 324 n.60 (5th Cir. 2018), as revised (Sept. 24, 2018); *see also Fisher v. Moore*, __ F. 4th __, 2023 WL 2533113, at *1, (5th Cir. March 16, 2023) ("This circuit has never adopted a state-created danger exception to the sweeping 'no duty to protect' rule. And a *never*-established right cannot be a *clearly* established one"); *Walker v. Livingston*, 381 F. App'x 477, 479–80 (5th Cir. 2010) ("[T]his court has held that the state created danger theory is 'not clearly established law within this circuit such that a § 1983 claim based on this theory could be sustained'").

37

about the claim's core legitimacy.[132] At the same time, how-
ever, the court has not specifically disclaimed a cause of action
under the state-created danger theory.[133, 134]

This indecision and circularity have left litigants and district
courts in the lurch: Supreme Court precedent has recognized
the state-created danger cause of action for some purposes
and the Fifth Circuit has provided a standard for reviewing
those claims, but it remains unclear if or when that standard
can be met and what remedy is available when it is. And when
presented with persuasive, analogous cases from its sister cir-
cuits defining the application of the theory,[135] the Fifth Circuit

---

[132] *See, e.g., McClendon v. City of Columbia*, 305 F.3d 314, 332 n.12 (5th Cir.
2002) (explaining that because "this circuit is littered with opinions ex-
pressing varying levels of skepticism," a reasonable officer in this circuit
"would be unclear as to whether there is a right to be free from 'state-
created danger'").

[133] *See Fisher v. Moore*, __ F. 4th __, 2023 WL 2533113, at *4, (5th Cir. March
16, 2023) ("we have not categorically ruled out the doctrine []; we have
merely declined to adopt this particular theory of liability"); *see also
McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 332–33 (5th Cir. 2002)
(holding that the Fifth Circuit has "neither adopted nor rejected the state-
created danger theory").

[134] At least explicitly barring the claim gives litigants the warning that the
claim is unavailable and would potentially allow them to explore different
paths for relief. It would also sharpen the Circuit split and make the issue
ripe for adjudication at the Supreme Court.

[135] *See, e.g., Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007); *Kneipp v.
Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); *Kallstrom v. City of Columbus*, 136
F.3d 1055, 1066–67 (6th Cir. 1998); *Jackson v. Indian Prairie Sch. Dist. 204*,
653 F.3d 647, 654 (7th Cir. 2011); *Carlton v. Cleburne Cnty.*, 93 F.3d 505, 508
(8th Cir. 1996); *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989);
*Uhlrig v. Harder*, 64 F.3d 567, 572–73 (10th Cir. 1995).

has simply, to borrow from Justice Scalia, "fann[ed] [its] fingers . . . under [its] chin."[136]

It is not only judges and lawyers who have been disadvantaged by this approach. The Fifth Circuit's categorical bar on holding government actors accountable for the dangers they create or enhance has also had nightmarish consequences for ordinary citizens in this Circuit.

Take, for example, *Doe v. Covington County School District*, 675 F.3d 849 (5th Cir. 2012) (en banc). Nine-year-old Jane Doe attended an elementary school in Covington County, Mississippi. School policy required her parents to identify all persons who were authorized to take Jane from school during the day.[137] On six separate occasions over a four-month period, however, school personnel allowed Tommy Keyes, a grown man, to take Jane from school, even though he was not on the list of people her parents authorized to do so.[138] In each instance, Keyes raped the child and returned her to the custody of the school officials.[139] Jane's guardians sued the school under a state-created danger theory, alleging that the school's check-out policy was "the direct and proximate cause of Jane's injury."[140]

---

[136] Antonin Scalia, *Letter to the Editor*, BOSTON HERALD (Mar. 29, 2006) at 5, https://www.thirteen.org/wnet/supremecourt/personality/print/doc16.html

[137] 675 F.3d at 852–53.

[138] *Id.* at 853.

[139] *Id.*

[140] *Id.*

These facts were not enough to persuade the Fifth Circuit to clarify its standard or provide relief for little Jane. Instead, the court "decline[d] to use th[at] en banc opportunity to adopt the state-created danger theory," holding that "the allegations would not support such a theory" because Doe could not show that the school was deliberately indifferent.[141]

The consequences of the Circuit Court's ambiguous-but-harsh standard were similarly dire for the Agwuoke family in *Estate of C.A. v. Castro*, 547 F. App'x 621 (5th Cir. 2013). In that case, a high school student (C.A.) drowned in a swimming pool during an experiment in Physics class. The Agwuokes sued the school district under the state-created danger theory, arguing that the student was a known victim because the parents signed an athletic participation form that did not permit the student to participate in water-based activities. Notwithstanding evidence of the school's specific knowledge of the student's inability to swim, or the possible deliberate indifference of the teacher for failing to review the participation form, the Fifth Circuit found that the dangers of drowning were not distinct to the victim, so the Plaintiffs would not satisfy that element "even assuming that th[e] court recognized the theory."[142]

And just last week, the Circuit Court again refused to recognize a state-created danger cause of action for a disabled student who was routinely sexually assaulted at school.[143]

---

[141] *Id*. at 864–65.

[142] *Estate of C.A.*, 547 F. App'x at 627.

[143] *Fisher*, __ F. 4th __, 2023 WL 2533113, at *1.

In the fall of 2019, M.F. was a middle school student in Fort Bend, Texas. Because of her mental and physical disabilities, she had an Individualized Education Plan (IEP) that required her to be escorted around the school "at all times."[144] Yet, on several occasions during that fall semester, M.F.'s teachers allowed her to wander the school without supervision. A fellow student, who had a history of severe behavior problems, including sexual misconduct, and was also subject to an IEP that required him to be escorted "at all times," followed M.F. into the school's restrooms and sexually assaulted her. School officials investigated the matter and confirmed M.F.'s account. But then they allowed it to happen again: not even two months later, the two students were allowed to leave their classrooms and wander the hallways unescorted and the same male student sexually assaulted M.F. in the bathroom again.

M.F.'s parents sued the school district and school officials on the theory that they had "created or increased the danger" to their daughter and had "acted with deliberate indifference" to those dangers. The Fifth Circuit granted qualified immunity to the school officials, noting that "the state-created danger doctrine is not clearly established in our circuit."[145] In a concurrence, Judge Weiner found it "well past time for this circuit to be dragged screaming into the 21st century by joining all of the other circuits that have now recognized the state-created danger cause of action."[146]

---

[144] *Id*.

[145] *Id*. at *4.

[146] *Id*., at *5 (Weiner, J., concurring).

These are three individual cases, but they are representative of the Fifth Circuit's jurisprudence in this area. In the decades since the Courts of Appeals began recognizing the state-created danger theory of liability, the Fifth Circuit has been loath to find any case that would meet the elements of the claim.[147] The result has been an ever-increasing encroachment on individual liberty and autonomy, depriving parents of a remedy even when government actors directly contravene their express prohibitions. Under such circumstances, it can no longer be said, I fear, that the citizens of this Circuit are the "masters of their destiny."[148]

### b.     The City of Jackson

The Plaintiffs' state-created danger claim against the City of Jackson must also fail.

To plead a state-created danger claim in this Circuit, the Plaintiffs would have to demonstrate (1) that the "defendants used their authority to create a dangerous environment for the plaintiff" and (2) "that the defendants acted with deliberate indifference to the plight of the plaintiff."[149] The deliberate indifference prong is further divided into three sub-prongs,

---

[147] *See, e.g., Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994) (refusing to decide whether a state-created danger theory was "constitutionally sound" in the context of a student being shot and killed at school); *Morin v. Moore*, 309 F.3d 316, 321 (5th Cir. 2002) (not "adopt[ing] or reject[ing] a state-created cause of danger in the context of a mass shooting by the mentally challenged son of a police officer); *Dixon v. Alcorn County Sch. Dist.*, 499 F. App'x 364 (5th Cir. 2012) (refusing to adopt or disclaim a cause of action for state-created danger where student was violently attacked by classmate who had a history of bullying the victim).

[148] *Liggett v. Lee*, 288 U.S. 517, 580 (1933) (Brandeis, J., dissenting).

[149] *Doe*, 675 F.3d at 865.

requiring the Plaintiffs to allege that "(1) the environment created by the state actor is dangerous, (2) the state actor must know it is dangerous (deliberate indifference), and (3) the state actor must have used its authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."[150]

The City of Jackson's primary argument concerns an element of the third sub-prong, namely that the Plaintiffs have failed to identify the third-party, non-state actor who is responsible their injuries.[151] The City's argument is well-taken. A state-created danger claim requires that a third party—not the defendant state actor—cause the plaintiff's injury.[152] The Amended Complaint attributes the Plaintiffs' state-created danger injuries to the City (and its agents) directly, not to any third party. As such, the Plaintiffs have not alleged an essential element of the claim.

Additionally, as noted in the Defendants' briefs, the Fifth Circuit requires the Plaintiffs to allege that the Defendants knew of the risk of "an immediate danger facing a known victim."[153] Under this extraordinarily high standard, a showing of increased "risk of harm to unidentified and unidentifiable

---

[150] *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001).

[151] Docket No. 81 at 9.

[152] *See Kinzie v. Dall. Cty. Hosp. Dist.*, 106 F. App'x 192, 195 (5th Cir. 2003) (affirming dismissal of state-created danger claim because plaintiff "did not allege that he was harmed by a third party").

[153] *Doe*, 675 F.3d at 866 (internal quotations and citations omitted) (emphasis added).

members of the public" is not enough—even when the Plaintiff themselves are members of the identified group.[154]

Nothing in the Amended Complaint suggests that the City or State Defendants knew that these specific Plaintiffs would be at an enhanced risk of harm as a result of the Defendants' (in)actions. True, the Amended Complaint goes into detail about the negative effects of lead on children and adults, and avers that the City of Jackson and MSDH knew or should have known of these effects. Those statements, though, do not demonstrate the Defendants' knowledge of the risk of harm to these specific Plaintiffs. And while the Court agrees with the Plaintiffs that such a rule creates unjust and perverse outcomes by allowing officials to "escape constitutional liability in the most heinous cases, where they knowingly injure entire communities,"[155] such is the law of the Fifth Circuit.

For these reasons, the City of Jackson's motion for judgment on the pleadings is **GRANTED** with respect to the state-created danger claim.

### B.        Mississippi Tort Claims Act

In Count III of their Amended Complaint, the Plaintiffs plead a state-law negligence claim against each of the Defendants.[156] The Plaintiffs argue that the Defendants "had a duty to Plaintiff[s] to exercise reasonable care on behalf of Jackson's citizens and water users," that the Defendants "breached their

---

[154] *Saenz v. Heldenfels Bros.*, 183 F.3d 389, 391–92 (5th Cir. 1999); *see also Cancino v. Cameron Cty., Texas*, 794 F. App'x 414, 417 (5th Cir. 2019).

[155] Docket No. 114 at 70 (citing *Guertin v. Michigan*, No. 16-CV-12412, 2017 U.S. Dist. LEXIS 85544, at *61-62 (E.D. Mich. June 5, 2017)).

[156] Docket No. 81 at 80–86.

duty," and that the Plaintiffs "suffered harm" as "a direct and proximate result of the [] Defendants' negligent conduct."[157] The Defendants offer various arguments on this claim; the Court takes them in turn.

### 1.    MSDH's Discretionary Function Immunity Claim

First, MSDH and Craig argue that the negligence claim cannot proceed against them because they are "entitled to discretionary function immunity under the [Mississippi Tort Claims Act] (MTCA)."[158] They argue that because the activities the Plaintiffs complain about "involve[] an element of choice and judgment," and are "susceptible to policy analysis," they are entitled to immunity.[159]

The Plaintiffs disagree. They maintain that the allegations against MSDH and Craig do not qualify for discretionary function immunity because their actions were neither discretionary "nor were they policy decisions."[160] But even if they were discretionary, the Plaintiffs contend, the State Defendants are still not entitled to discretionary function immunity because immunity attaches only where the decisions (even if discretionary) "involve application of public policy."[161]

The MTCA "covers actions for personal injuries caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of [their] office or

---

[157] *Id.*

[158] Docket No. 61 at 23.

[159] *Id.* at 27–29.

[160] Docket No. 80 at 26.

[161] *Id.* at 30 (citing *Bailey v. City of Pearl*, 282 So. 3d 669, 672 (Miss. 2019)).

employment."[162] The default rule under the MTCA is that "political subdivisions like [MSDH] are not immune from tort claims."[163] "But the Legislature carved out several exceptions" to the default rule.[164] Mississippi Code Section 11-46-9(1)(d) is one such exception. That Section confers "discretionary function immunity" on governmental entities and their employees if those entities and employees are acting in the course and scope of employment.[165]

To determine whether governmental entities and their employees are entitled to discretionary function immunity, Mississippi courts apply the "public policy function test," also known as the "*Wilcher*" test.[166] Under that test, the court must first "ascertain whether the activity in question involved an element of choice or judgment."[167] "If so," the court must then "decide whether that choice or judgment involved social, economic, or political-policy considerations."[168] Thus, *Wilcher* established a two-step, conjunctive test, and required both steps to be met before immunity could attach.

---

[162] *Wilcher v. Lincoln Cty. Bd. of Supervisors & City of Brookhaven, Miss.*, 243 So. 3d 177, 185 (Miss. 2018) (internal quotation marks omitted).

[163] *Id.* at 181; *see* Miss. Code Ann. § 11-46-3.

[164] *Wilcher*, 243 So. 3d at 181.

[165] *Id.*

[166] *Id.* at 182; *see also Strickland v. Rankin Cty. Sch. Dist.*, 341 So. 3d 941, 944 n.1 (Miss. 2022) (noting that *Wilcher* "readopted the two-part public-policy function test put forth by the United States Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991)).

[167] *Wilcher*, 243 So. 3d. at 187 (internal quotations omitted).

[168] *Id.*

In *Williams v. City of Batesville*, 313 So. 3d 479 (Miss. 2021), however, the Mississippi Supreme Court came back with a sort-of "Step Zero": before reaching the two-part *Wilcher* test, the court must also specifically "identif[y] 'the activity in question'—the allegedly tortious act giving rise to the claim."[169] So that is where the analysis starts.

The parties dispute the "activity in question" here. The State Defendants' motion variously characterizes the activity in question as relating to "MSDH's testing drinking water and notifying the City of the results of those tests,"[170] and "regulation of the State's public water suppliers."[171] But the Plaintiffs allege that the "activity in question" took three, more specific forms.

First, they allege that the State Defendants "utilized a pre-flushing method when testing Jackson's water for lead knowing that this technique artificially lowers lead testing results."[172] Next, they allege that the State Defendants "failed to provide the citizens of Jackson with information that their water was contaminated with lead despite know[ing] the lead levels were in excess of federal and state lead limits and that ingesting lead causes serious injury to children."[173] Finally, the Plaintiffs claim that the State Defendants "issued boil

---

[169] 313 So. 3d at 483.

[170] Docket No. 61 at 24.

[171] *Id.* at 26.

[172] Docket No. 80 at 28.

[173] *Id.* at 29.

water notices despite [knowing] that boiling water concentrates lead in the water rather than dissipating it."[174]

Viewing the facts in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have sufficiently pled each of the "activit[ies] in question" as against the State Defendants. As to the first, the Plaintiffs specifically allege that "MSDH guidelines instructed [employees] taking samples to run water slowly, which causes less lead to be dislodged from pipes."[175] The Plaintiffs further allege that "Defendant Craig crafted the MSDH's directions on testing methodology ["pre-flushing"] to yield generally lower results," as "it is well known that pre-flushing is a technique that can be (and has been) used to manipulate lead testing."[176]

The Plaintiffs also sufficiently plead the second activity in question. At numerous places throughout the Amended Complaint, the Plaintiffs allege that MSDH and Craig "intentionally [withheld] critical public health information" and "fail[ed] to warn Jackson's citizens and water users of the lead in Jackson's drinking water," despite having found "seriously high lead levels . . . in 22% of Jackson's homes."[177]

And, as to the third activity in question, the Amended Complaint explains that "[i]n February 2016, Craig warned small children and pregnant women not to consume tap water without boiling it" and alleges that "th[at] advice was dangerously ignorant," given the fact that "[b]oiling water exacerbates lead

[174] *Id.*

[175] Docket No. 51 at 42.

[176] *Id.* at 44.

[177] *Id.* 51 at 46–49.

48

toxicity because the water boils off and evaporates but the lead does not, leading to a higher concentration of toxic lead in the resulting drinking water."[178] Thus, the Plaintiffs have sufficiently pled each of the three activities in question.

The Court must now consider whether the activities meet the *Wilcher* test. Because the government defendant is entitled to discretionary function immunity "only when both parts of the test are met,"[179] the Court need not address step one it finds that the government would not prevail on step two—or vice versa. Therefore, the Court assumes without deciding that each of the activities in question "involve[] an element of choice or judgment" as required under the first step.[180] The State Defendants still fail at the second step.

At the second step, the Court must determine whether that "choice or judgment involved social, economic, or political-policy considerations."[181] The *Wilcher* court's analysis of step two is instructive. In that case, Mr. Wilcher sued the Lincoln County Board of Supervisors and the City of Brookhaven, Mississippi for simple negligence after his vehicle "suddenly crashed into a big hole."[182] The County and City moved to dismiss on the basis that the suit was barred by the MTCA's discretionary function immunity provision. The trial judge granted their motions.

---

[178] *Id.* at 61.

[179] *Wilcher*, 243 So. 3d at 187.

[180] *Id.* at 182.

[181] *Id.*

[182] *Id.* at 181.

Reviewing the grant of immunity *de novo*, the Mississippi Supreme Court articulated the two-step test for determining when government defendants get immunity and decided that the test was not met on the facts before it. The court explained that this "is not a case . . . [where] plaintiff was trying to use his tort action to second-guess the government's discretionary policy decision on how best to regulate traffic," but was instead one of simple negligence concerning "the construction crew's alleged failure to barricade or warn."[183] Mr. Wilcher was not contesting "the placement or lack of placement of a traffic-control device"—which "could involve immunized policy decisions"—but rather the dangerous conditions that the construction crew created by failing to warn.[184] That failure, the court held, "was not the result of a policy decision . . . it was straight-up negligence."[185]

This case, too, is one of straight-up negligence. The Plaintiffs are not broadly challenging the State Defendants' regulation or operation of the water system. As in *Wilcher*, their claims are, at heart, basic failure to warn claims. They have alleged that "a simple act of negligence, and not a real policy decision, caused [their] injur[ies]."[186] "Therefore, the [State

---

[183] *Id.* at 187–88.

[184] *Id.*

[185] *Id.* at 188.

[186] *Id.*; *see also Moses v. Rankin Cty.*, 285 So. 3d 620, 626 (Miss. 2019) ("maintenance decisions do not involve policy considerations"); Docket No. 79 at 30 n.4 ("Plaintiffs discuss Defendants' conduct in terms of simple negligence in this portion of the brief because that is the applicable standard").

Defendants] cannot take refuge in discretionary-function immunity."[187]

## 2. Defendants' Notice-of-Claim Defense

Next, the Defendants argue that the Plaintiffs' negligence claim cannot proceed because it violates multiple provisions of the MTCA's notice-of-claim requirement. The State Defendants argue that the Plaintiffs have not "submitted any medical proof that [they] experienced elevated levels of lead in [their] blood," "identif[ied] the specific periods during which [they were] exposed to elevated lead levels," or "provide[d] any evidence that [their] homes were tested for lead, when the testing took place, or what the tests showed," as (supposedly) required under Mississippi Code § 11-46-11(2)(b)(i)–(iii).[188]

In response, the Plaintiffs note that the State Defendants "do not deny that Plaintiffs served notices of claim or complain of their timing."[189] Instead, they observe, the Defendants attack "the sufficiency of Plaintiffs' notice of claim," specifically arguing that "Plaintiffs failed to append documents" or provide proof.[190] But, the Plaintiffs argue, the State Defendants "cite to no authority requiring Plaintiffs to provide such proofs with their notices of claim."[191] And, in any event, "the information

---

[187] *Wilcher*, 243 So. 3d at 188.

[188] Docket No. 61 at 30.

[189] Docket No. 79 at 35.

[190] *Id*. at 37.

[191] *Id*.

Plaintiffs provided was substantial enough to comply with [the statute]."[192]

Mississippi law provides that

> every notice of claim shall . . . Contain a short and plain statement of the facts upon which the claim is based, including the circumstances which brought about the injury, the extent of the injury, the time and place the injury occurred, the names of all persons known to be involved, the amount of money damages sought, and the residence of the person making the claim at the time of the injury and at the time of filing the notice.[193]

The essential question at issue here is "how much compliance is enough to meet the purposes of the MTCA?" The Mississippi Supreme Court has read the statute to require "substantial compliance."[194] While that court's decisions do not paint a cohesive picture of what substantial compliance is, they have been somewhat clearer about what it is not: "substantial compliance is not the same as, nor a substitute for, non-compliance."[195]

In *Fairley v. George County*, 871 So. 2d 713 (Miss. 2004), the court expounded upon that distinction. Confronted with a plaintiff whose notice of claim only provided the time and place of the injury, the court held that a plaintiff who

---

[192] *Id.*

[193] Miss. Code Ann. § 11-46-11(1)(b)(iii).

[194] *S. Cent. Reg'l Med. Ctr. v. Guffy*, 930 So. 2d 1252, 1255 (Miss. 2006).

[195] *Gale v. Thomas*, 759 So. 2d 1150, 1158 (Miss. 1999).

neglected to provide information on most of the statutory factors was "non-complaint."[196] More recently, in *Burnett v. Hinds County ex. rel. Board of Supervisors*, 313 So. 3d 471, 478 (Miss. 2020), the court went even further, holding, inconsistent with much of its precedent, that "all seven categories of information listed in the statute must be contained in the notice of claim."[197]

Regardless of which definition the Mississippi Supreme Court considers controlling, the notices of claim at issue here substantially comply with the MTCA's procedural mandates. That is clear from the State Defendants' own argument. They do not argue that the Plaintiffs failed to provide any (or even either) of the seven statutorily-required categories. (If that were the case, the notice could arguably be considered non-compliant.)[198] Instead, the State Defendants simply argue that the Plaintiffs did not prove the statements alleged in their notice.[199] But the State Defendants do not point to (and this

---

[196] 871 So. 2d at 718.

[197] *But see, e.g., Lee v. Memorial Hospital at Gulfport*, 999 So. 2d 1263, 1266–67 (Miss. 2008) (holding that the plaintiff substantially complied even though her notice failed to provide her residence at the time of the injury or at the time of the notice).

[198] *See Guffy*, 930 So. 2d at 1258.

[199] At oral argument, counsel for MSDH and Craig argued that the Plaintiffs' notices did not substantially comply with the statutory requirements, particularly the "extent of the injury" and "names of all persons known to be involved" requirements. With respect to the "extent of the injury" requirement, MSDH would have the Plaintiffs provide medical documentation of their injuries with their notice of claim. Of course, that is a higher standard than what is required to file a complaint because it would require plaintiffs' injuries to be fully known and diagnosed before they can bring a claim. As it relates to the "names of all persons known to be involved"

Court could not find) any Mississippi caselaw requiring Plaintiffs to prove at the notice stage—before any litigation has been initiated—the allegations contained in their notices of claim.

Rather, Mississippi Supreme Court precedent establishes that where the plaintiff has provided information in each of the required categories, the court examines the actual information that the plaintiff provided to determine whether the compliance is substantial.[200]

In this case, the Plaintiffs' notices of claim gave the available details about the nature and extent of the Plaintiffs' injuries, the time period in which those injuries occurred, the individuals who suffered those injuries (including their geographic location), and the amount of damages they suffered. These details were more than sufficient to meet the statutory factors as well as the underlying purposes of the MTCA, which are to "insure [sic] that governmental boards, commissioners, and agencies are informed of claims against them" and to "encourage them" to "take corrective action as soon as possible

---

requirement, MSDH would have plaintiffs provide the names of all the individuals who live in the home because those individuals would likely have seen the Plaintiffs drink the water. But counsel would not extend that logic to others who would have seen the Plaintiffs consume the water. For example, counsel would not require the names of teachers or defendants who allegedly caused the Plaintiffs to drink the water. This type of parsing highlights the arbitrariness that would result if the Court were to adopt the State's theory of what "substantial compliance" requires. If such arbitrary lines are to be drawn, they should be drawn by the Mississippi Legislature or the Mississippi Supreme Court, not this Court. To date, neither body has drawn such lines.

[200] *See Lee*, 999 So. 2d at 1266–67 (evaluating the specific facts alleged within the plaintiff's notice).

when necessary."[201] Thus, the State Defendants' motion to dismiss the Plaintiffs' MTCA claim is **DENIED**.

The individual and City Defendants' notice of claim argument is a bit different. They do not join the insufficiency argument. Instead, the individual and City Defendants contend that the Plaintiffs' negligence claim violates the MTCA's provision which requires plaintiffs to file a notice of claim with the City clerk "at least ninety (90) days before instituting suit."[202] Because the Plaintiffs filed the required notice on October 18, 2021, one day before they filed this suit, "Count III should be dismissed," they argue.[203] The individual defendants also argue that the Plaintiffs' state-law claims should be dismissed because each of the individual defendants acted within the course and scope of their employment.[204]

In response, the Plaintiffs concede that they failed to meet the MTCA's 90-day requirement for filing suit in two of the consolidated cases, but maintain that they met the requirement in Cause No. 3:22-CV-171.[205] Because these cases are consolidated, they argue, "the issue should be deemed moot."[206] But even if the Court were to find their notice deficient in the earliest-filed cases, "the issue may be resolved simply because neither the statute of limitations nor the notice requirement

---

[201] *Id.* at 1266.

[202] Docket No. 81 at 11 (citing Miss. Code Ann. § 11-46-11(1)); Docket No. 83 at 23; Docket No. 87 at 6.

[203] Docket No. 81 at 11–12.

[204] Docket No. 83 at 23; Docket No. 85 at 16; Docket No. 87 at 6.

[205] Docket No. 114 at 82.

[206] *Id.*

poses a barrier to relief."[207] That is because "[t]he filing of the Complaint tolled the statute of limitations," so any dismissal would be without prejudice" and the Plaintiffs could "refile without sending a second notice letter."[208]

As a general matter, compliance with the notice requirements of the MTCA "is a hard-edged, mandatory rule which the [Mississippi Supreme Court] strictly enforces."[209] That is true regardless of a plaintiff's reason for failing to meet the 90-day notice requirement.[210] But the Mississippi Supreme Court has made exceptions to that general rule. For example, in *Greenwood Leflore Hospital v. Watson*, 324 So. 3d 766 (Miss. 2021), the court held that a plaintiff need not serve a second notice of claim if a later-filed Complaint satisfies the 90-day requirement.

This Court could not find any analogous case where the Mississippi Supreme Court has resolved the question at issue here. To that end, the Court considers the MTCA's statutory scheme to see if the statute yields any guidance.

The MTCA seeks to provide redress to persons injured by the government, but it balances those private interests against the government's interest in having an opportunity to resolve claims without suit. The notice requirement is one place where the statute attempts to harmonize those dual purposes.

---

[207] *Id.*

[208] *Id.*

[209] *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815, 820 (Miss. 2006).

[210] *See Price v. Clark*, 21 So. 3d 509, 518 (Miss. 2009) ("[s]trict compliance with statutory notice is required, regardless of why the plaintiff failed to provide notice").

So, how should the Court resolve this case to best meet the MTCA's dual purposes? In a consolidated case like this one, where the Plaintiffs have complied with the letter of the law in one instance and have thus perfected notice on the government defendants, the spirit of the statute may be best served by allowing the Plaintiffs' claims to proceed. This is particularly true when there would be no bar to the Plaintiffs' refiling. Such an approach would also promote wise judicial administration and conserve judicial resources.

But, considering the strong language from the Mississippi Supreme Court about the strictness of MTCA procedural rules, this Court will err on the side of strictly enforcing the 90-day requirement. Therefore, the City of Jackson's motion for judgment on the pleadings is **GRANTED** with respect to the MTCA claims in Cause Nos. 3:21-CV-663 and 3:21-CV-667, and those claims are **DISMISSED WITHOUT PREJUDICE** to their refiling.[211]

Again, the City of Jackson's notice requirement argument does not apply to the MTCA claims in Cause No. 3:22-CV-171 because that suit was filed more than 90 days after the City received the Plaintiffs' notices of claim. Thus, having found the City's argument and the individual Defendants' remaining arguments in Cause No. 3:22-CV-171 to be without merit, the City of Jackson's motion with respect to the MTCA claims in that case are **DENIED**.

Additionally, to the extent that the Plaintiffs bring MTCA claims against the individual defendants in their personal

---

[211] When the cases are refiled, counsel shall note on the Civil Cover Sheet that the new filing is related to this instant case so that the new action will be processed accordingly.

capacities, those claims must be dismissed. A governmental employee acting within the course and scope of their employment is not a proper party for an MTCA claim.[212] The same result would amount if the Plaintiffs intended to sue the individual defendants in their official capacity.[213] Consequently, the individual defendants' motions to dismiss and for judgment on the pleadings as to the state-law MTCA claims are **GRANTED**.

## IV.   Conclusion

For the foregoing reasons:

- Defendant Jim Craig's Motion to Dismiss and for Qualified Immunity, Docket No. 60, is **GRANTED**.

- Defendant Mississippi State Department of Health's Motion to Dismiss, Docket No. 60, is **DENIED**.

- Defendant City of Jackson's Motion for Judgment on the Pleadings, Docket No. 80, is **GRANTED** as to the Plaintiffs' state-created danger claim and as to the state-law negligence claims alleged in Cause Nos. 3:21-CV-663 and 3:21-CV-667, but **DENIED** as to all other claims.

---

[212] *See Franklin Cnty. Mem.'l Hosp. v. Mississippi Farm Bureau Mut. Ins. Co.*, 975 So. 2d 872, 874 (Miss. 2008); *see also Suddith v. Univ. of Southern Mississippi*, 977 So. 2d 1158, 1177 (Miss. Ct. App.2007) ("no employee of a governmental entity shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties").

[213] *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000) (when "a defendant government official is sued in his individual and official capacity[,] . . . [t]he official-capacity claims and the claims against the governmental entity essentially merge").

- Defendants Tony Yarber's and Kishia Powell's Motion to Dismiss and for Qualified Immunity, Docket No. 82, is **GRANTED**.

- Defendants Chokwe A. Lumumba's and Robert Miller's Motion to Dismiss and for Qualified Immunity, Docket No. 84, is **GRANTED**.

- Defendant Jerriot Smash's Motion for Judgment on the Pleadings and for Qualified Immunity, Docket No. 86, is **GRANTED**.

**SO ORDERED**, this the 23rd day of March, 2023.

s/ CARLTON W. REEVES
*United States District Judge*

59